UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
CARMEN VALDEZ,                                  :

                                               :      16 Civ. 292 (GWG)

                     Plaintiff,

     -v.-                                        :      OPINION AND ORDER

CAROLYN W. COLVIN,                              :
Acting Commissioner of Social Security,

                                               :

                     Defendant.                 :
--------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

     Plaintiff Carmen Valdez brings this action to review the final decision of the

Commissioner of Social Security finding that Valdez is not disabled and thus not eligible for

Social Security benefits.  The Commissioner moves for judgment on the pleadings pursuant to

Fed. R. Civ. P. 12(c).[1]  Valdez has moved for summary judgment under Fed. R. Civ. P. 56(a).[2]

The parties have consented to this matter being determined by a United States Magistrate Judge

pursuant to 28 U.S.C. § 636(c).  For the reasons stated below, the Commissioner's motion for

judgment on the pleadings is granted and Valdez's motion for summary judgment is denied.

---

    [1]  See Notice of Motion, filed June 17, 2016 (Docket # 18); Memorandum of Law in
Support of Defendant's Cross-Motion for Judgment on the Pleadings and in Opposition to
Plaintiff's Motion for Judgment on the Pleadings, filed June 17, 2016 (Docket # 19) ("Def.
Mem.").

    [2]  See Motion for Summary Judgment, filed May 27, 2016 (Docket # 15); Memorandum
of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, filed May 27, 2016
(Docket # 16) ("Pl. Mem.").

I.      BACKGROUND

        A.      Procedural History

        Valdez applied for Disability Insurance Benefits and Supplemental Security Income on

June 14, 2012.  See Administrative Record, filed Apr. 25, 2016 (Docket # 13) ("R."), at 256-66.

The Social Security Administration ("SSA") denied Valdez's application on October 4, 2012.

R. 120.  Valdez requested a hearing on this decision before an Administrative Law Judge

("ALJ").  R. 129.  Valdez's first hearing was held on December 13, 2013.  R. 80-111.  Because a

vocational expert was not present, see R. 109-10, a supplemental hearing took place on April 4,

2014, R. 58-79.  In a May 28, 2014, ruling, the ALJ found that Valdez was not disabled.  R. 51-

52.  Valdez requested review of the ALJ's decision and the Appeals Council denied that request

on November 27, 2015, making the ALJ's determination the Commissioner's final decision.

R. 1-4.

        B.      The Hearings Before the ALJ

        Valdez testified that she lived alone in an apartment in Yonkers, New York.  R. 84-85.

Valdez was born in the Dominican Republic and came to the United States on July 4, 1990.

R. 61, 85.  At the time of the hearing, she was 37 years old, five feet, four inches tall, and

weighed 170 pounds.  R. 85.  She is right handed.  R. 85-86.  Valdez completed a ninth-grade

education in the United States, but cannot read and write beyond identifying information such as

her name, address, and social security number.  See R. 61-62, 87.

        Valdez worked part time as a grocery stocker beginning February 1, 2008.  See R. 89-90,

93, 100-01.  Working as a stocker involved lifting heavy items to put them on store shelves.  See

R. 64-65, 90-91.  Valdez also returned items to the shelves and checked the store for expired

items.  R. 65-69, 89.  On July 21, 2013, she injured her back lifting heavy products.  See R. 90-

2

91, 99.  At some point before her workplace injury, Valdez had been out of work for 10 months because of a shoulder infection caused by an injection.[3]  R. 91-92.  Before working in the grocery store, in 2007, Valdez worked at a McDonald's restaurant cooking and "do[ing] the dishes," but not waiting on customers.  R. 92-93.  Prior to 2007, Valdez did not work and received support from her husband's disability income.  R. 71-72.

Valdez testified that "[e]verything" hurt "[h]alf of the time" and that she was "in pain 24/7."  R. 93.  According to her testimony, her back hurt, as well as her legs and left shoulder. Id.  At the time of the hearing, Valdez was receiving therapy for her shoulder problems as well as taking medicine.  R. 94.  Valdez took muscle relaxants, asthma medicine, and something for migraine headaches.  Id.  She also took medicine for depression.  See id.  When Valdez was depressed, the only thing she would do is remain in a dark room alone, take pills, and sleep.  See R. 104.  Before the hearing, however, Valdez was able to travel to New Jersey from her home to receive medical treatment.  See R. 105.

Valdez said she stayed "up all night," and that she could not sleep well "because [of] the pain."  R. 95.  She was able to wash and dress herself in the morning, but could not sit down for long periods of time because of the pain.  See R. 96.  She did not want to do anything as a result of the pain and all she could do was stay in bed "half of the time."  See id.  Valdez received aid from family or friends once a month to help her get groceries and bring them back to her home, because "she cannot carry" anything.  Id.  Once a week, Valdez's neighbor or Valdez's aunt

---

[3]  It is unclear from her testimony exactly when Valdez returned to work after the infection.  Valdez initially said that she returned to work from the injection injury around three or four months before her July 2013 back injury, which would be in March or April of that year. See R. 99.  But she also claimed that she returned to work in August, prior to her back injury, which if true would have to have been in 2012.  See R. 99-100.

3

would help clean Valdez's apartment.  R. 97.  Valdez was able to dress herself.  Id.  She took

public transit to go to her doctor's appointments.  R. 98.  She used a cane that was given to her

by "St. John's."  Id.  By Valdez's own estimation, the heaviest thing she could carry was her

purse, the longest she could stay standing was five minutes, and the longest she could remain

seated was between 15 and 20 minutes.  R. 98-99.

Valdez testified that she went to the hospital on September 27, 2013, due to pain from an

ovary problem.  R. 101.  She was in the hospital for five days.  R. 102.  In October 2013, Valdez

went to the hospital due to her asthma, because of the pain in her ovaries, and/or as a result of

gastritis.  See R. 102-03.  Valdez was also in the hospital for her shoulder in 2012.  R. 103.

At a supplemental hearing held after the initial examination of Valdez, the ALJ

questioned a vocational expert ("VE").  R. 60.  The VE classified Valdez's previous work as that

of a stock clerk in a grocery store, with a Dictionary of Occupational Titles ("DOT") number of

299.367-014, with an "SVP" of 4.[4]  R. 73-74.  The VE said this was a semi-skilled job at the

"medium range."  R. 74.

Among the hypothetical questions posed to the VE was one that concerned someone with

Valdez's unskilled work profile, who could lift 10 pounds frequently — and heavier weights of

20 pounds occasionally — with the ability to only occasionally lift, reach, push, pull, or perform

---

[4]  The DOT has been replaced by an online database called the Occupational Information Network, or the O*NET.  See Dictionary of Occupational Titles Fourth Edition, Revised 1991, U.S. Dep't of Labor, http://www.oalj.dol.gov/libdot.htm.  The O*NET defines Special Vocational Preparation ("SVP") as the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  O*NET OnLine Help - Specific Vocational Preparation (SVP), O*NET OnLine, https://www.onetonline.org/help/online/svp.  The SVP "levels" correspond to time periods.  Level 4 is "[o]ver 3 months up to and including 6 months."  Id.

overhead work with her left side, and who needed to avoid "concentrated respiratory irritants."
See R. 74.  The ALJ asked the VE if such a person could perform any jobs.  Id.  The VE testified
that such a person could find available jobs, and identified three such jobs: ticket taker,
housekeeping cleaner, and small products assembler.  R. 74-75.[5]

      C.    <u>Medical Evidence</u>

The Commissioner has provided a summary of the medical evidence contained in the
administrative record.  See Def. Mem. at 4-17.  Plaintiff has not objected to the summary, as had
been required by the Court to the extent she had objections.  See Scheduling Order, filed Apr.
27, 2016 (Docket # 14), ¶ 5.  Accordingly, the Court adopts the Commissioner's summary as
accurate and complete for purposes of the issues raised in this suit.  We discuss the medical
evidence pertinent to the adjudication of this case in section III below.

      D.    <u>The ALJ's Decision</u>

The ALJ denied Valdez's application for benefits on May 28, 2014.  R. 39-52.  The ALJ
found that Valdez had several severe impairments, including "chronic obstructive pulmonary
disease (COPD), gastrointestinal reflux disease (GERD), gastritis, cervical disc disease, cervical
sprain, lumbar radiculopathy[,] and depression."  R. 41.  However, the ALJ found that Valdez
did not have any impairments that corresponded to listings 1.00 or 3.00 of 20 C.F.R. Part 404,
Subpart P, Appendix 1 for these impairments.  R. 42.  Thus, the ALJ found neither Valdez's
musculoskeletal nor her respiratory impairments severe enough to constitute a regulatory
disability.  See id.  The ALJ also found "no objective documentation of marked restrictions"
related to mental disorders under listing 12.00 of 20 C.F.R. Part 404, Subpart P, Appendix 1.  Id.

---

[5] The ALJ posed other hypothetical questions to the VE.  R. 76-77.

The ALJ found that Valdez had "the residual functional capacity to perform light work," as long as it was unskilled, involved only occasional lifting, reaching, pushing, pulling, and overhead work with her upper left side, and allowed her to avoid frequent concentrated exposure to respiratory irritants.  R. 43.  Because of Valdez's impairments, the ALJ found that Valdez could not perform any past relevant work.  R. 50.  However, the ALJ found that, based on Valdez's age, education, work experience, and residual functional capacity, jobs existed in "significant numbers in the national economy" that Valdez could perform.  Id.  For these reasons, the ALJ found Valdez was not disabled, as defined by the Social Security Act, from June 9, 2012, to the date of the decision.  R. 51.  Finding no disability, the ALJ denied Valdez's applications for Disability Insurance Benefits and Supplemental Security Income.  R. 51-52.

II.    GOVERNING STANDARDS OF LAW

A.    Scope of Judicial Review Under 42 U.S.C. §§ 405(g) and 1383(c)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (internal quotation marks omitted) (quoting Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012)); accord Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (citation omitted); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); id. § 1383(c)(3) ("The final determination of the Commissioner of Social Security . . . shall be subject to judicial review as provided in section 405(g) . . . .").  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted) (quoting

Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)); accord Selian, 708 F.3d at

417; Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447-48 (2d Cir. 2012) (per curiam).

"Even where the administrative record may also adequately support contrary findings on

particular issues, the ALJ's factual findings must be given conclusive effect so long as they are

supported by substantial evidence."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per

curiam) (internal quotation marks omitted) (quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d

Cir. 1982)).  Thus, "[i]f the reviewing court finds substantial evidence to support the

Commissioner's final decision, that decision must be upheld, even if substantial evidence

supporting the claimant's position also exists."  Johnson v. Astrue, 563 F. Supp. 2d 444, 454

(S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)); accord McIntyre

v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational

interpretation, the Commissioner's conclusion must be upheld.") (citing Rutherford v.

Schweiker, 685 F.2d 60, 62 (2d Cir. 1982)).  The Second Circuit has characterized the

"substantial evidence" standard as "a very deferential standard of review — even more so than

the 'clearly erroneous' standard."  Brault, 683 F.3d at 447-48 (citing Dickinson v. Zurko, 527

U.S. 150, 153 (1999)).  "The substantial evidence standard means once an ALJ finds facts, [a

court] can reject those facts only if a reasonable factfinder would have to conclude otherwise."

Id. at 448 (emphasis in original) (internal quotation marks omitted) (quoting Warren v. Shalala,

29 F.3d 1287, 1290 (8th Cir. 1994)).  "The role of the reviewing court is therefore quite limited

and substantial deference is to be afforded the Commissioner's decision."  Johnson, 563 F. Supp.

2d at 454 (internal quotation marks omitted) (quoting Hernandez v. Barnhart, 2007 WL

2710388, at *7 (S.D.N.Y. Sept. 18, 2007)).

B.      Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); accord id.

§ 1382c(a)(3)(A).  A person will be found to be disabled only if it is determined that his

"impairment or impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy."  Id. §§ 423(d)(2)(A),

1382c(a)(3)(B).

To evaluate a claim of disability, the Commissioner is required to examine: "(1) the

objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037

(2d Cir. 1983) (per curiam) (citations omitted); accord Brown v. Apfel, 174 F.3d 59, 62 (2d Cir.

1999) (per curiam); Wilson v. Colvin, 107 F. Supp. 3d 387, 400 (S.D.N.Y. 2015).

Regulations issued pursuant to the Social Security Act set forth a five-step process that

the Commissioner must use in evaluating a disability claim.  See 20 C.F.R. § 404.1520(a)(4); see

also Burgess, 537 F.3d at 120 (quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir.

2003)) (describing the five-step process).  First, the Commissioner must determine whether the

claimant is currently engaged in any "substantial gainful activity."  20 C.F.R.

§ 404.1520(a)(4)(I).  Second, if the claimant is not engaged in substantial gainful activity, the

Commissioner must decide if the claimant has a "severe medically determinable physical or

mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of

impairments that "significantly limits [the claimant's] physical or mental ability to do basic work

activities," id. § 404.1520(c).  Third, if the claimant's impairment is severe and "meets or

equals" one of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1, and "meets the duration

requirement," the claimant must be found disabled.  Id. § 404.1520(a)(4)(iii).  Fourth, if the

claimant's impairment does not meet or equal one of the listed impairments, or does not meet the

duration requirement, the Commissioner must review the claimant's residual functional capacity

to determine if the claimant is able to do the work he or she has done in the past, i.e., "past

relevant work."  Id. § 404.1520(a)(4)(iv).  If the claimant is able to do such work, he or she is not

disabled.  Id.  Finally, if the claimant is unable to perform past relevant work, the Commissioner

must decide if the claimant's residual functional capacity, in addition to his or her age,

education, and work experience, permit the claimant to do other work.  Id. § 404.1520(a)(4)(v).

If the claimant cannot perform other work, he or she will be deemed disabled.  Id.  The claimant

bears the burden of proof on all of these steps except the final one — that is, proving that there is

other work the claimant can perform.  See Cichocki v. Astrue, 729 F.3d 172, 173-74 n.1 (2d Cir.

2013) (per curiam) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)); Poupore v. Astrue,

566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

     C.     The "Treating Physician" Rule

     In general, the ALJ must give "more weight to opinions" of a claimant's treating

physician when determining if the claimant is disabled.  See 20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2); see also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (the

ALJ must give "a measure of deference to the medical opinion of a claimant's treating

physician").  Treating physicians "may bring a unique perspective to the medical evidence that

cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ must accord "controlling weight" to a treating physician's medical opinion as to the nature and severity of a claimant's impairments if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  Id. §§ 404.1527(c)(2), 416.927(c)(2). Inversely, the opinions of a treating physician "need not be given controlling weight where they are contradicted by other substantial evidence in the record."  Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted); accord Selian, 708 F.3d at 418 ("The opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record.") (citations omitted).

If the ALJ does not give controlling weight to a treating physician's opinion, the ALJ must provide "good reasons" for the weight given to that opinion.  See Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015) (per curiam) (citation omitted); Halloran, 362 F.3d at 32-33 (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)).  When assessing how much weight to give the treating source's opinion, the ALJ should consider factors set forth in the Commissioner's regulations, which include (I) the length of the treatment relationship and the frequency of the examination; (ii) the nature and extent of the treatment relationship; (iii) the supportability of the opinion with relevant evidence, particularly medical signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v) whether the opinion is from a specialist; and (vi) other relevant evidence.  See 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6); see also Ellington v. Astrue, 641 F. Supp. 2d 322, 330-31 (S.D.N.Y. 2009) ("the ALJ should

weigh the treating physician's opinion along with other evidence according to the factors" listed in 20 C.F.R. § 404.1527(c)(2)-(6)).  The Second Circuit has stated that it will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ[s] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."  Halloran, 362 F.3d at 33; see also Greek, 802 F.3d at 375-77 (remanding where "ALJ did not provide any [valid] explanation for why [a treating physician's] opinion was not well-supported").

      D.     Credibility Determinations

"It is the function of the [Commissioner], not [the reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) (citing Perales, 402 U.S. at 399; McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 705 (2d Cir. 1980); and Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)).  Thus, the ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the degree of impairment."  Tejada v. Apfel, 167 F.3d 770, 775-76 (2d Cir. 1999) (summarizing and citing with approval a decision in Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985)).  Nonetheless, when discounting a claimant's credibility regarding her residual functional capacity, regulations impose some burden on the ALJ to explain her decision.  As the Second Circuit has stated:

> When determining a claimant's [residual functional capacity], the ALJ is required to take the claimant's reports of pain and other limitations into account, 20 C.F.R. § 416.929; see McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980), but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the

credibility of the claimant's testimony in light of the other evidence in the record. Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).

Genier, 606 F.3d at 49.

The SSA has issued regulations relating to reports of pain or other symptoms affecting the ability to work by a claimant for disability benefits.  20 C.F.R. §§ 404.1529(c), 416.929(c). These regulations provide, inter alia, that the SSA "will not reject [a claimant's] statements about the intensity and persistence of [her] pain or other symptoms or about the effect [her] symptoms have on [her] ability to work solely because the available objective medical evidence does not substantiate [her] statements."  Id. § 404.1529(c)(2); accord id. § 416.929(c)(2).  The regulations also provide that the SSA "will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [a claimant's] statements and the rest of the evidence."  Id. §§ 404.1529(c)(4), 416.929(c)(4).

Where an ALJ rejects witness testimony as not credible, the basis for the finding "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record."  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing Carroll, 705 F.2d at 643); see also Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999).  The ALJ must make this determination "in light of medical findings and other evidence[] regarding the true extent of the pain alleged by the claimant."  Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984) (internal quotation marks omitted) (quoting McLaughlin, 612 F.2d at 705).  However, where an ALJ gives specific reasons for finding the claimant not credible, the ALJ's credibility determination "is generally entitled to deference on appeal."  See Selian, 708 F.3d at 420 (citing Calabrese v. Astrue, 358 F. App'x 274, 277 (2d Cir. 2009) (summary order)).  Thus, "[i]f the [Commissioner's] findings are supported by substantial evidence, the court must uphold the

12

ALJ's decision to discount a claimant's subjective complaints of pain." Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (citations omitted); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

III.   DISCUSSION

Valdez challenges the decision denying her disability essentially on the ground that it was not supported by substantial evidence — raising in particular arguments regarding the weight given to treating-physician opinions and the ALJ's evaluation of Valdez's credibility, as well as the ALJ's improper reliance on the VE's testimony.   We address these issues next.[6]

A.   The ALJ's Consideration of Treating-Physician Evidence and the Evaluation of Valdez's Credibility

Valdez argues that the ALJ improperly disregarded the opinions of treating physicians. Valdez focuses on Drs. Sayegh, Shah, Cushner, Blanco, and Schulman, claiming that the ALJ "should have relied on [their] credible opinions."  Pl. Mem. at 7.  We will look at each in turn.

The ALJ discussed treating physician Dr. Sayegh's records and found no indication of "any particular ongoing restriction."  R. 44.  Dr. Sayegh's early treatment of Valdez, initiated before the alleged onset date, showed a steadily improving respiratory condition.  See R. 423-30. After Valdez received injections of "ceftriaxone," "Depo-Medrol," and "Solu-Medrol," in May 2012, R. 424-30, 433, and complained of shortness of breath in June 2012, R. 436, Dr. Sayegh's notes do not mention any ongoing limitations beyond a diagnosis of a past medical history of

_____

[6]  Valdez provides no argument attacking the ALJ's decision insofar as it finds that her claims of mental impairments did not affect her residual functional capacity.  See generally Pl. Mem.  Thus, we will not address further the issue of whether there was substantial evidence to support the ALJ's findings in this area.  In any event, we find the Commissioner's arguments on this point persuasive.  See Def. Mem. at 14-17, 24.

asthma and chronic obstructive pulmonary disease, <u>see</u> R. 497.  In a March 25, 2013, letter, Dr.

Sayegh does not even mention any respiratory problems.  R. 447.  The ALJ noted this, stating

that "examinations failed to demonstrate any ongoing shortness of breath or other alarming

abnormality to [Valdez]'s lungs."  R. 44; <u>see also</u> R. 46.  The entire time Valdez was treated by

Dr. Sayegh, up until June 25, 2012, her lungs were "[c]lear to auscultation."  R. 423-37.

 One of Dr. Sayegh's letters, dated December 10, 2012, stated that Valdez was

"complaining of lower back pain and left shoulder pain," because of her history of "cellulitis in

left shoulder and neck area."  <u>See</u> R. 445.  Dr. Sayegh's opinion, based on Valdez's complaints,

was that the patient was "unable to return to work until further notice."  <u>Id.</u>  However, "the

opinion of a treating physician, or any doctor, that the claimant is 'disabled' or 'unable to work'

is not controlling, since such statements are not medical opinions, but rather opinions on issues

reserved to the Commissioner."  <u>O'Dell v. Colvin</u>, 2016 WL 6882861, at *24 (S.D.N.Y. Nov. 22,

2016) (citations and internal quotation marks omitted); <u>accord</u> <u>Snell</u>, 177 F.3d at 133 ("the

ultimate finding of whether a claimant is disabled and cannot work" must be made by the ALJ

and "[a] treating physician's statement that the claimant is disabled cannot itself be

determinative") (citation omitted).  Additionally, the ALJ was justified in describing this and

other opinions as based on "subjective" complaints rather than on objective medical findings.

<u>See</u> R. 45.

 Later, on April 10, 2013, Dr. Sayegh wrote a request to Valdez's employer to excuse her

from work, but the period of rest lasted just one day and listed "no [r]estriction" on the line

entitled "Restrictions/Disabilities."  R. 503.  An earlier letter excusing Valdez from work, dated

December 31, 2012, stated only that Valdez could not lift or pull anything heavy, R. 504 — a

conclusion that the ALJ accepted, R. 46 (Valdez has "limitation[s] on her ability for heavy

14

lifting, carrying and other activities").

On December 29, 2012, Dr. Shah similarly found that while Valdez had back pain, she was unable to lift, push, or pull only "heavy objects." R. 502. No other restrictions were listed. See id. Notably, while on February 13, 2013, Valdez complained to Dr. Shah of "constant" and "10/10" pain, R. 535, Dr. Shah's report, consisting of a "nerve conduction study," found "no electrical evidence," see R. 536. The ALJ noted this finding, stating correctly that the report contained "no evidence of radiculopathy or neuropathy to account for complaints of radiating upper extremity pain." R. 44 (citing R. 535-40).

Valdez's motion papers state that Dr. Shah's tests of Valdez's lower extremities were "consistent with Ms. Valdez's complaints of low back pain radiating to both legs with associated weakness, numbness, and tingling." Pl. Mem. at 7. The test referenced by Valdez occurred on December 12, 2012, and reflected findings of radiculopathy only related to the lumbar (L-4/L-5) region, not the upper left extremity. See R. 539. As the ALJ noted, R. 45, Dr. Shah's later reports only recommended against "heavy lifting" and to not "push or pull," R. 615; see also R. 502. Indeed, as late as February 19, 2014, Dr. Shah even recommended that Valdez "[c]ontinue" to exercise. R. 615. In determining the severity of Valdez's impairments, the ALJ did not discount Dr. Shah's findings but instead gave "great weight" to Dr. Shah's opinion that Valdez was unable to lift, push, or pull heavy objects. See R. 50.

Valdez argues that the ALJ did not give proper weight to the opinion of Dr. Schulman, Pl. Mem. at 7, a consultative physician who found that Valdez had "marked subjective complaints of pain far exceeding objective findings," R. 488-89. While Dr. Schulman did find limited back flexion in addition to tenderness in the back, he also found good range of motion in the hips and a normal exam result for the lower extremities following a neurological evaluation

on October 3, 2013.  R. 488-89.  Dr. Schulman's examination of Valdez's spine found a good

gait and good heel-toe standing.  R. 488.  While recommending that Valdez return for another

examination in three months and suggesting further studies be done, Dr. Schulman stated that

Valdez could be treated with "pain management injections."  See R. 490.  While this report

shows some evidence of pain, it does not mention any exertional limitations and thus supports

the ALJ's final decision.

The reports of Drs. Cushner and Blanco similarly support the ALJ's decision.  At the

February 19, 2013, and March 5, 2013, appointments with Dr. Cushner, Dr. Cushner found that

Valdez was "in no apparent distress during [the] examination."  R. 551, 556.  Dr. Cushner noted

"[t]enderness to palpation of the left paravertebral [muscles]," but "no pain with cervical

compression."  See id.  He diagnosed Valdez with "Cervical myalgia, Fibromyalgia, Left

Trapezial Myalgia / myofasciitis."  R. 551, 557.  On March 5, 2013, Dr. Cushner referred Valdez

to pain management physician Dr. Blanco, who saw her the same day.  See R. 557, 559.  Dr.

Cushner did not opine that Valdez had any exertional limitations.

Dr. Blanco similarly found Valdez to be in "no acute distress."  R. 560.  At her March 5,

2013, meeting with Dr. Blanco, Valdez showed normal cervical spinal alignment and normal

posture.  Id.  Dr. Blanco found moderate restriction to Valdez's cervical range of motion with

pain at the end of the range of motion, but also found that her left and right shoulders had five-

out-of-five strength.  Id.  Valdez experienced tenderness, spasms, and trigger points in her

trapezius and cervical muscles.  See R. 561.  Dr. Blanco decided against trigger point injections

until the source of the spasms could be determined.  Id.

When Valdez returned to Dr. Blanco for treatment days later, she was seen by a nurse

practitioner.  See R. 554.  Valdez was upset that she could not see Dr. Blanco because she

needed him to "write her letters for Social [S]ecurity disability."  See id.  Valdez did not receive

treatment and refused to make a follow-up appointment.  See id.  Valdez returned to see Dr.

Cushner on March 28, 2014, where she was treated by a different physician at Dr. Cushner's

medical group.  See R. 547-50.  Valdez's left shoulder "show[ed] forward elevation to 45

degrees with pain after that," as well as "[e]xternal rotation . . . to 30 degrees and internal

rotation . . . to the level of L5."  R. 547.  Her cervical spine showed "normal chin to chest

flexion," but with pain noted on extension.  Id.  The examination notes indicated paraspinal

muscle tenderness and assessed shoulder impingement syndrome as well as shoulder bursitis.

R. 547-49.  Valdez was to meet with Dr. Cushner later to discuss the possibility of surgery.

R. 548.[7]

The ALJ correctly noted that the examinations by Drs. Cushner and Blanco showed "no

persistence of objective deficits consistent with the presence of a highly limiting back, shoulder

or musculoskeletal condition."  R. 45.  Rather, as the ALJ stated, these doctors' reports indicated

"moderate symptoms that would not preclude [Valdez] from light activities."  Id.  There is a

substantial basis in the record to support this finding because, as already discussed, these reports

did not show exertional limitations.  Further, as the ALJ noted, at one visit, Valdez made clear

she wanted to see Dr. Blanco solely for Social Security paperwork and refused to receive

---

[7]  Valdez submitted records showing that Dr. Cushner performed a surgery to her
right shoulder on May 20, 2015, after the ALJ's decision.  R. 9-11.  The records submitted to the
ALJ, by contrast, reflect repeated complaints about the left shoulder, not the right shoulder.
Valdez makes no argument that the May 20, 2015, surgery reflects on the period of disability at
issue in her application, which was from June 9, 2012 (the alleged onset date) until May 28,
2014, the date of the ALJ's decision.  Thus, the evidence is not relevant to our decision.  See 20
C.F.R. §§ 404.970(a)(5), (b), 416.1470(a)(5), (b) (permitting review of an ALJ's decision based
on new evidence submitted to the Appeals Council only if, inter alia, the evidence "relates to the
period on or before the date of the [ALJ's] hearing decision").

treatment or schedule a follow-up appointment.  Id.  In light of Valdez's subjective complaints of debilitating pain, the refusal to see a pain specialist supports the ALJ's decision that Valdez did not suffer restrictions from pain.

Valdez argues that the ALJ focused too much on Dr. Lathan's assessment of her to the detriment of other treating physicians.  See Pl. Mem. at 6-7.  However, Dr. Lathan's assessment was in important respects consistent with Valdez's treating physicians.  Dr. Lathan concurred that Valdez had "[s]evere restriction[s] for lifting, carrying, pushing, pulling and reaching with the left upper extremity," while at the same time noting "no acute distress" as well as "[s]trength [of] 5/5 in the right upper and lower extremities, and 4/5 in the proximal left upper extremity." R. 338-40.  The ALJ accepted that Valdez had these restrictions.  See R. 46 (stating that Dr. Lathan's opinion was "generally consistent with the substantial evidence of record").[8]

The only times the ALJ did not accept a treating physicians' statement occurred when the physician stated in a conclusory fashion that Valdez could not work, without explaining specific restrictions.  See R. 49-50 (citing R. 386-87, 388, 395, 445-46, 497-99, 500-04, 565-67).  For example, in various brief letters, Dr. Harvey described Valdez's pain and said that Valdez was "unable to work" and was "totally disabled."  R. 386-87, 567.  No objective records accompany these letters.  Similarly, Dr. Sayegh wrote an undated letter which simply recounted the pain Valdez alleged she was suffering and her complaints of worsening conditions.  R. 616.  While Dr. Sayegh claimed that Valdez could not "work and [was] totally disabled," the letter was

---

[8]  Apparently referring to Dr. Lathan, Valdez also argues that his report was given improper weight because he was "the Workers' Compensation carrier's consultant 'independent' medical examiner" and that reports of such examiners are "notriously biased."  Pl. Mem. at 6-7. The argument is unsupported by any case law and we reject the notion that an ALJ has the obligation to give a particular weight to a medical examination associated with a worker's compensation claim.

conclusory, based on Valdez's subjective complaints, and not supported by objective findings.

See id.  Dr. Sayegh's earliest letter written on behalf of Valdez, on December 10, 2012, stated

that she was "complaining of lower back pain and left shoulder pain," and followed with the

conclusion that Valdez was "unable to return to work until further notice."  See R. 445.  On

December 31, 2012, Dr. Sayegh again excused Valdez from work until further notice because of

her "severe shoulder pain."  R. 504.  Finally, on April 10, 2013, Dr. Sayegh excused Valdez

from work for one day, with no other annotation beyond "no [r]estriction," on a line reserved for

listing restrictions or disabilities.  See R. 503.

Dr. Antonelli simply reported what Valdez told him, writing "[t]his is to state that Ms.

Valdez . . . reports she is in severe back pain and left shoulder pain — daily."  R. 388.  The ALJ

concluded that this statement was "[c]learly . . . little more than a summary of [Valdez]'s own

subjective allegations and contains nothing of the therapist's own findings."  R. 50.  The ALJ

gave the report no weight in part because it "assess[ed no] specific functional restrictions."  Id.

This and other conclusions of the ALJ about notes based only on Valdez's subjective complaints

were justified given that the notes were not "well-supported by medically acceptable clinical and

laboratory diagnostic techniques."  See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Thus, the

ALJ did not err in giving little weight to these treating physicians' conclusions that Valdez was

unable to work and was disabled.  See Snell, 177 F.3d at 133 ("the ultimate finding of whether a

claimant is disabled and cannot work," is to be made by the ALJ and "[a] treating physician's

statement that the claimant is disabled cannot itself be determinative") (citation omitted).

Valdez challenges the ALJ's determinations that she did not meet the criteria for listings

1.00 and 3.00 of 20 C.F.R. Part 404, Subpart P, Appendix 1, which relate to disorders of the

musculoskeletal system and respiratory disorders, arguing that the determination was

19

unexplained.  Pl. Mem. at 7, 9.  However, "the absence of an express rationale does not prevent [a court] from upholding [an] ALJ's determination," if the evidence the ALJ had before her indicated that her decision was based on substantial evidence.  Berry v. Schweiker, 675 F.2d 464, 468 (2d Cir. 1982) (per curiam).

In attacking the ALJ's decision, Valdez addresses only the conclusion as to her musculoskeletal condition.  Pl. Mem. at 7-8, 9.  Valdez claims that Dr. Shah's EMG studies showing L4-L5 radiculopathy and Dr. Andrus's CT scan revealing C5-C6 disc osteophyte complex were consistent with her complaints.  Id. at 7-8 (citing R. 539, 543).  The ALJ recognized these findings, but also found that without more they did not indicate "restrictions [that] would preclude a significant range of sitting, walking or standing," or "preclude [Valdez] from light work activities," respectively.  R. 46.  The record supports this conclusion and does not indicate that these clinical findings showed restrictions beyond what was accepted by the ALJ in making her determination of Valdez's residual functional capacity.  In fact, the ALJ accepted both Dr. Lathan's opinion that Valdez suffered "severe limitations for lifting, carrying, pushing, pulling, and reaching with the left upper extremity," and Dr. Shah's opinion that she was "unable to lift, push or pull heavy objects."  R. 46, 50.  These same medical reports found that Valdez could "perform all activities of personal care and daily living," despite the presence of some upper-body limitations, R. 337, and was able to exercise, R. 615.

Valdez argues that the ALJ improperly found Valdez's testimony to be not credible.  See Pl. Mem. at 8-9.  She argues that the ALJ failed to "fully analayz[e]" Valdez's testimony and "merely state[d] that [the ALJ] did not find" her to be credible.  Id. at 9.  However, the ALJ's conclusion that Valdez's "allegations of her inability to work . . . as a result of her functional limitations [were] not fully credible," R. 44, is followed by a lengthy analysis as to why this was

the case.  See R. 44-50.  As already discussed, the ALJ examined the record and weighed the

various conclusions of the physicians who examined Valdez.  Id.  The ALJ noted Valdez's

complaints of pain, including her assertion that she had pain "everywhere."  R. 44, 603; see also

R. 93 (Valdez testifies that "everything" hurt).  But, as the ALJ noted, see R. 45, doctors

consistently found her to be in no acute or apparent distress at her appointments, see R. 338, 547,

551, 556, 560, 581.  One physician, Dr. Schulman, even noted that Valdez's "complaints of pain

far exceed[ed] objective findings," R. 488-89 — a fact specifically noted by the ALJ, R. 46.

Additionally, as the ALJ noted, see R. 48, on March 18, 2013, Valdez attempted to see her pain

doctor to obtain disability paperwork but refused pain treatment that day and refused to schedule

a follow-up appointment, see R. 554.

Because there was substantial evidence supporting the ALJ's finding that Valdez was not

entirely credible in the description of her pain and limitations — as reflected in her testimony

and in the records of medical sources — and because the ALJ witnessed Valdez at the hearing to

assess her credibility, we do not have a basis to overturn the ALJ's decision as to her credibility.

B.    The ALJ's Reliance on the VE's Testimony

Valdez argues that the ALJ improperly relied on the VE's determination of the jobs

available to someone in Valdez's condition because the VE did not expressly consider the effect

that taking all of Valdez's prescribed medications would have on her ability to work.  Pl. Mem.

at 8.  However, no adverse impact or diminution of ability to work had been indicated by any

doctor, and Valdez points to no medical evidence regarding side effects of medication that would

impact her ability to work.

IV.    CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings

(Docket # 18) is granted and Valdez's motion for summary judgment (Docket # 15) is denied.

The Clerk is requested to enter judgment and to close this case.

SO ORDERED.

Dated: February 3, 2017
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

22